and Mental Retardation, Ms. McDonough. Yes, sir. Good morning. Good morning. I am here to represent, as you noted, the Delaware County Mental Health and Mental Retardation Office, as well as Dr. Klein, the administrator. And the case, I'd like to reserve two minutes if I could, for rebuttal in the event that it's necessary. That request will be granted. Thank you. We're here because of basically two orders of Magistrate Judge Hart in the lower court. The first was his granting compensatory education, a five-month period of compensatory education, on the belief that there was a complete cessation of services to two-year-old twins that were suffering from autism and developmental disabilities when they attended at the decision of the parents, a private school, a private preschool for toddlers, basically. I hesitate to say preschool because it's really, it's an infant and toddler type of program as opposed to the kind of preschool that generally is over the age of three. As the court probably knows from the briefs and understands, Delaware County nor the state require or provide for infant and toddler daycare. Okay, let me say my question, which I could not I think the briefs on both sides could have been more clearly written. Did the twins get that five months program elsewhere than at the infant school? And that gets to the burden of proof issue, unfortunately. Did they? I'm not talking about... Are you asking me to go outside the record and answer your question? I could do that. Yes, that's what I'm asking you to do. And the answer would be yes. They did get it? Yes. Yeah, okay. At least we were billed for it. I can tell you that the services were billed and paid for. There were outside contractors at Cades that were providing services both in the home and at the Cades center where the family was being serviced. And what I was able to ascertain, not having interviewed the people because I was not the trial lawyer and I wasn't producing evidence, but I wanted to know the answer to the same question that you asked. I wanted to know, is this a red herring? Is it much the coded services that Judge Hart was concerned about were billed and paid for by the county, by the Cades personnel? And I don't think the mother ever really contested that. If you look at her testimony, she loved Cades. She thought that they were the best thing that ever happened in the lives of her children. They provided her with excellence at all times. I think what she wanted and what she asked for was something a little bit more. She wanted to have her two twins at the same school as her older child. I think she wanted to have them exposed to a developmental program that wasn't being offered for any children, whether they were disabled or otherwise, other than if you paid for it on your own. And so she did that. She enrolled them in St. Faith's program and she paid for it on her own. She testified that about two months after she did that, she asked two things. One, whether the county would pay for the tuition. Understandably, everybody would like that to happen. And the second thing she asked for a little bit later was whether there could be any services provided on site. And I think that that became a debate over what types of services might there be necessary to offer at St. Faith's to get that program really going for the boys, to get them integrated, to get some special dialogue going on between the people that were giving the service at St. Faith's and the children and their peers but that was a whole different type of service, a whole different plan. And that would require some thinking, planning and implementing and wasn't going to be something that could have happened in January when the county wasn't even asked to do anything for two months after they first went there. And ultimately they did work an extra program out. Here, what Judge Hart said is that if there was evidence that they were receiving services at Cades during the period in time or and it's a problem. I asked for consideration in the lower court for that very reason. I said there isn't any proof. I couldn't offer proof at that point because the record was closed and I asked for the judge. Ms. McDonough, you started out to say, why don't you pull that microphone down so it's, okay, there you go. I'm a little short. It doesn't want to come down as far as I can. Rather than hitting your head. You started out to say the issue here is compensatory education and compensatory services. But did you challenge that? Did you challenge the hearing officers finding that Delaware County was required to provide compensatory services? The hearing officer never found that. The hearing officer never found or awarded any services for the hearing officer. It was found that they were entitled to services in their natural environment, was it not? What the hearing officer found is that tuition should be paid for by the county because the services, and this is what was a little confusing about what the hearing officer found. She found that the services that could have been provided at St. Faith's were being What services was St. Faith's providing? We don't know. We don't know anything about that program. We don't know how long it was. Was it a two-hour program, which generally these programs are very short when you're talking about the age child involved, or was it a program of a structured program such as a Montessori program where they were teaching counting and pre-reading skills? We don't know anything about it. Who does that fall on, that we don't know stuff in the record? I believe that it falls on the parents, and I believe that it falls on the person challenging that there should have been something else provided. And that's why the Schaefer burden is really on the person that's saying things didn't happen. So is there no evidence in the that they were entitled to these services and weren't getting them? The only services, the issue before the hearing officer, there were two issues before the hearing officer who's an attorney and who's very good, and they were whether there were some PEC services. Before you go there, let me see if I can get any answer to that question. Is there any evidence in the record to support the plaintiff's position that they were entitled to these services and weren't getting them? No. The five months of services, the speech, occupational, physical, no. I could find nothing in this record at all that would support it, and I could find only one thing, a hint of it, that would say it wasn't the case. And it's in March, it's in notes of the progress notes in March, saying that the family was in for a discussion on starting another speech group for one of the children. And why would they be doing that if they were abandoned? If it's not already obvious, I'll be asking that same question to your opponents. I think that I just want to make sure that you understood there was the dispute before the hearing officer involved the provision of PEC services, a communication program. That's not through Cades, that was through Pyramid, another consultant. And there were some service hours missing, and that's not something that Judge Hart had to decide later because that was resolved. But she was finding that there were PEC hours missing on this communication system, and it turns out if you look at the record, the reason they were missing is because the service provider was doing summer camps, and it goes back to this summer camp dispute. The person couldn't be in two places at once, and she couldn't be doing it on the summer camps, or he, at the same time they were doing it. So that was worked out eventually, and it was resolved. Ms. McDonough, why don't you address the Rehabilitation Act question? Yes, I would like to do that. Under the Rehabilitation Act, you would need to find that there was a state mandate that there be a preschool paid for by the county, and that the Rehabilitation Act required in some way that infants and toddlers receive least restrictive means services in a setting outside the home. And it just doesn't say that. The Rehabilitation Act talks about putting people on an equal playing field. They want to put the non-disabled children on the same playing field as the disabled children. This case actually puts the disabled child way ahead. It's the only case, it's the only case that I'm aware of in Pennsylvania that says Pennsylvania, or counties, not even Pennsylvania, I should say, the county has to fund daycare, preschool, whatever the parents want for the disabled youngsters when they don't fund it for anyone else. And that's where it puts it's an unequal playing field. So I don't think the Rehabilitation Act certainly is implicated there at all. Didn't the district court in this case essentially find that since there was a violation of the Part C of the IDEA that there was therefore a violation of the Rehabilitation Act? He did, Your Honor. And Part C, Part C gives more. Part C, it's a grant program. And basically it was enticing the states to come in and deal developmentally with children that were struggling to get them off to a really good head start. It wasn't, it's not a Rehabilitation Act statutory, we're going to punish you if you do something wrong kind of statute. It was, we'll give you money and we're going to look into and try to find best practices as we go along. It's a 20-year-old program. It's been amended once. The first 10 years, the natural environment was all considered to be at home because most of the moms or dads or whoever the care providers were, were stay-at-home people. The services were all there. About 10 years ago, they amended it to allow the natural environment to start to move out and for it to be out in different places, daycare centers, because women started to work or there weren't grandparents or people available to take care of the children, so they had to move the services out to daycare providers or places like that. It's an evolving process and that's why there isn't, I would say that Congress didn't put an attorney fee provision in there. It's something that's still evolving even as we speak. If you look at this family, they were essentially trailblazers to ask for paid daycare for children that are not entitled to it by county regulations or rules, by state regulations or rules, and they got it. The beauty of it is the county gave it to them, but then what they wanted more. They wanted attorney fees, which was something that wasn't provided for in the act, and with all due deference and respect for the Public Interest Law Center, where does the money come from? It's not in the grant program, certainly. It's not in the state's program. Well, is your problem then with the fact that they're seeking attorney's fees and not with the fact that there may be a rehabilitation? In other words, is it possible to have a Rehabilitation Act claim without having entitlement to attorney's fees? Well, discretionary-wise, under the Rehabilitation Act, it would be. I think that you could have a Part C violation and a Rehabilitation Act violation concurrently. You could have that. For instance, in this case, if the county said, we just don't want to provide services anymore, and since you're going to a preschool and it's more convenient for us to provide services at 915, and you're not going to be available, we're just not going to do anything for you. Again, that's it. Go away. You could have a violation, perhaps, there of the Rehabilitation Act, where they completely abandon people and refuse to provide services, but that's not what happened here. Let me circle back, if I can, for just a second. You say that, going back to the record, this is from the district court. It said that the defendants do not argue here, nor did they argue before the hearing officer, that the prescribed services were actually provided. If the district court is left in the position of understanding that the services are not provided, and it's not contested that they weren't provided. Well, it was, Your Honor, though. It was from the beginning. The complaint in this case, if you look at the complaint, it starts out, we want attorney's fees, and then it goes on to say, at some point, we have services that were provided. Now, beyond that, the statement of Ms. Ransom, who's an attorney, that's all the evidence there ever was on the issue. There's not an affidavit from the mother. At the deposition, she waxed poetic about the services of Cades, never suggesting that services were discontinued by them or the county. There's no evidence at all. And Judge Hart can say, well, we didn't argue, but we did consistently say, there's no evidence of this, Your Honor. There's no evidence of it. And finally, and I was not involved at the trial level, but when I did get involved on reconsideration, I said, please, if you really feel that way, let us at least come back. And if that's really how you feel, you don't want to bring reconsideration, let us go back and put the evidence on the record. And he said, it's too late. And that goes to the burden of proof. That's the burden of proof issue that is crucial, I think, in the case. And it's that the judge believed that it was the obligation of the county to definitively prove that all those services were provided just because Ms. Ransom said they weren't. Thank you, Ms. McDonough. We'll call you back, everybody. Ms. Ransom. Looks like that microphone doesn't want to quite cooperate this morning. It doesn't, excuse me, it doesn't, Your Honor. My name is Barbara Ransom. I'm an attorney for my colleague, Michael Churchill. We're representing the parents of L.E.'s in this matter. Your Honor, this case is clearly about one issue, and that is whether or not the services that were requested by the parents provided in the children's natural environment, those services were speech therapy and specialized instruction. The parents never, ever argued that all services that were provided were completely eliminated. We believe that Judge Hart was absolutely correct in the decision that he reached, as was the hearing officer. So the issue is where were the services provided, not if the services were provided. The services, the services from what we see in the record were not provided. The request was to have these services, the five months, they were provided, they just weren't provided where you want them. No, Your Honor. The services that were not provided were specialized instruction and speech therapy in a classroom setting. Were they provided, were speech therapy, were they provided somewhere? There were services that were provided, and that's what makes this case a little bit confusing. Because Judge Hart seems to be under the impression they weren't provided at all. Exactly. The specialized instruction. And shouldn't, shouldn't someone have elucidated him on whether they were provided at all or not? Well, Your Honor, that's exactly what we asked. When you will see from the transcript at the due process hearing, there is a transcript. And in that transcript, I clearly stated that there is, there are no documents that we have in our possession. And if there are any documents, they are in the possession of the county. Well, but of course the parents, I mean, you're representing the parents and you can talk to the parents and you can say what was provided, right? Right. And those services were not provided in the classroom setting. Okay, but they were provided somewhere else. No, Your Honor. Those services were not provided. They may have been provided at Cades where the children were not attending. They may have been provided there. The children were not there. The children were attending services. So you're saying that the services were provided to the children, but the children didn't go? The services may have been provided. The answer, we don't know. All right, what does your client say about whether the children got any services at Cades? The children continued to receive services by Cades at home. There were other services. The services of specialized instruction and speech therapy in the classroom setting were not provided. Okay, but were services of specialized instruction and speech therapy provided anywhere? They were not provided to those children. Were they? No. No. They didn't, would they have been provided if the parents had taken them to Cades? That is a possibility if the children were attending Cades that the services would have been there. But you're saying the children did not at all, anywhere get special instructions and speech therapy? Right. The children did receive some speech therapy instruction in the form of PECS, a communication system that was provided by another agency. Is the question availability, maybe if we use the word available, were the services available at Cades if the parents wanted to take the twins to Cades, but the parents chose not to take the kids to Cades? Is that what you're talking about? Well, your honor, we've gotten right to the heart of the Rehabilitation Act issue and the natural environment issue, and that is that the parents were requesting services to be provided in a typical setting. That's not Judge Jordan's question. I'm just trying to get at a factual issue right now. Were they available? I'm not making any judgments here about whether it was a good idea or a bad idea for the parents to have done what they did. I'm just trying to find out, as a factual matter, were these services that the parents wanted for their two boys, were they available at Cades and the parents said we don't want to take them there? That probably was the case. The services were continuing to be provided because Cades was a classroom. It was like another school, and in that school there was a teacher, and in that school there was a speech therapist, but the children were not in that school. The children were in another school, so the speech therapist was still there. They continued to have therapy sessions over there in that place, but that's not where the children were. Now, the question I had asked of Ms. McDonough earlier, I do want to ask of you, can you point to anything in the record that shows me what the plaintiffs put in in the way of evidence, not attorney argument, but evidence about what the twins were and weren't provided in the way of services? Yes, your honor. When you look at the record, as it relates to the progress notes, in the progress notes for both boys, the parent asked in January 20, 2003, asked for the services to be provided in the typical setting, and the county refused to provide them the services. The county said flat out no, we will not provide you services in that setting. There was a five-month period where they persisted in that, correct? Yes. I take it from January to the end of the St. Faith's school year in May, that was the period during which the county refused to provide the services. Well, in May, the county sent in an evaluator to make an assessment of whether or not the services could be provided in that setting, and that evaluator came back to the county and said yes, we can provide services in that county. That report was started in June 14, 2003. And then they began to do that in that setting from June forward, did they not? Yes. Okay. Yes, and that is exactly... So the IDEA claim, which is currently pending, is for the compensatory services that you didn't get for the period from January through May 2003. January through June, yes. Through June 2003, that's what the claim is. Yes. And that is the heart of our Rehabilitation Act claim also, because you asked a question... Do you actually have, incidentally, the appendix site for what you were referring to? Yes, Your Honor, I do. And that is at 6... Sorry, 629 in the record. It's in a couple different places, Your Honor. Easily at 687, Mrs. McDermott was asking that she said she had found a place on her own and had contact information. And then as you read in the record, you will see that she repeated her request in March. And also, again, finally in May, Vicki was sent in to do a re-evaluation to assess whether or not the children could receive services. So those progress notes show that the request was made for the services and that finally, in May, when the county sent in its evaluator to assess whether or not the services could be provided, specialized instruction and PECS therapy could be provided there, why else, it's a reasonable inference that the services were not being provided, why else would the county then send in an evaluator to make a determination of whether or not the services could be provided there. And then there was, following that, in June, June 14, there was a determination that yes, the services could be provided there. And an IFSP addendum was made. We don't have that IFSP addendum because those are records that were records that were maintained by the county. And as I told, explained to the hearing officer, we didn't have all the records. We thought that these records needed to come from the county. And Judge Roth, as you explained in your ruling in Bucks County, the Commonwealth of Pennsylvania, that the review that the district court had to make was a modified de novo review of looking at the record that was presented to the hearing officer and then accepting any additional information that would be provided by the parties at the request of the parties. The parties did not request any request of the judge to take in any additional information because the parents had no additional information. The county didn't come forward with any records, any evidence to say, here, here's a record that shows, yes, indeed, we did provide the services to the children in that place. The question isn't, and I'd like to get back to this because I think it's very important, Judge Jordan. The question isn't whether the services were being provided somewhere else. The question is that these children needed their services to be provided in a typical setting. And that is, in fact, the testimony of Ms. McMahon and the testimony of Ms. Blandon, two employees of the county that said if the parents found a typical placement, then that typical placement would be the place where the services would be provided. It is the obligation of the county to provide a writing to explain why or why not those services were provided in that typical setting when the parent made the request. There is no documentation in the record explaining why the county made a decision not to provide services in that typical setting. The IDEA Part C allows the parents, allows children, and clearly, for children in a zero to three population, it is fundamentally important that these children receive their services and services like services that would improve their social interaction and their communication skills, that they receive these services in a setting with typically developing peers. That was the problem in this case. The children were not making meaningful progress. As a result of not making meaningful progress, the parent began to ask for a typical setting. The county explained, no, we can't, we don't provide services in a typical setting when that typical setting is outside of the home. And that's what the law provides, right? And that's what the law provides, that the services can be provided in a typical setting, which can be the home, but the law also provides, and as Ms. McMahon's testimony makes clear, the law also provides that you can receive those services in a typical preschool. And as you did in the Bucks County case, Judge, I would apply the same analysis and reasoning that you did in looking at whether or not the environment that the parents, where the parents placed the child, whether or not it was important that that environment be equal to the environment that the state had an obligation to provide. Those children would have made much more progress on their development in social and communication interaction had they been receiving the services all along. They did not receive the services, and it is fundamental when you look at the fact that the county then turned around and said, well, you know, we're going to do this now, and then provided the services there. Why, if the county had been providing the services all along in the typical setting, there would have been no question. I'd like to address this. Ms. McDonough said the services were provided and paid for. At Kades, they were not provided to these children. And if the county made a mistake and paid for a provider to deliver these services, that the parent cannot be held accountable for. Yes, Your Honor. Do you want to talk about the Rehabilitation Act? Yes, Your Honor, I'd like to talk about the Rehabilitation Act. I know that you and Judge Jordan just sat in on an en banc panel, an A.W. case recently, and that case talked about the Rehabilitation Act. Although it was a 1983 issue, we think that the savings clause that was discussed in that argument is the same savings clause that tells us clearly that the Rehabilitation Act is a right that parents can access, is a claim that parents can access in order to identify rights to which their children have been denied. Let me ask one quick question. Should we, and sorry to take you off this, should we be thinking about or waiting for or taking into account what the court does in A.W. before? I mean, is that going to have applicability here? No, Your Honor, because the court made clear that Mottola is still good law in this jurisdiction. The A.W. case was about Section 1983. There was a full discussion and even the Attorney General from New Jersey agreed that the Rehabilitation Act was reachable through the 1450s addresses the title, the whole title of the act which incorporates Part C. We believe that Schaefer is not controlling in this matter, and we believe that because the parties came to this court, came to the district court saying, look, we will write, we will agree to do motions for summary judgment. Both parties came on motions for summary judgment. That meant that there were no facts in dispute, no material facts in dispute. And indeed, in the brief that was submitted by the county to the district court, there were no facts in dispute that were material to the issue. They raised the issue that we provided services to Pyramid Consulting doing an observation of the boys. So we did provide services in that environment. They did not affirmably state that they provided any other services in that environment. Ms. Ransom, if the IDEA doesn't provide for fees under Part C, and keeping in mind the Arlington case, Arlington School Board case, is it appropriate to permit fees under the Rehabilitation Act? Well, Your Honor, I see that my time is up, but I'd like to address that question if I may. You may address that question. Thank you, Your Honor. Yes, it is appropriate. Every Part C case is not a Rehabilitation Act claim, and DeMora was definitely not. That was a deprivation of services. This case, the county instituted a policy of discrimination against these children, all children whom the county serves, by having in place only contracts with providers who would provide services in the and procedures in place that denied the right to have the services that the children needed to be to be provided in an integrated placement where they would be able to model the behavior of their typical peers. So this Part C case also involves a Rehabilitation Act claim, which the parents did make from the due process hearing level all the way through to the district court level and here again before you. It was both a Rehabilitation Act claim and a Part C claim. Can you recover attorney's fees in this case if we would find that there is no Rehabilitation Act violation? Your Honor, that would, and I think that goes to the Arlington question that Judge Jordan asked, and that would say since the language of the statute does not contain a fee and provision in that particular part, then we find ourselves without the ability to to recover fees. Okay, thank you, Ms. Ransom. Thank you. Judge McDonough. I am concerned that there's an allegation that the county is discriminating by placing children in a segregated setting. In this case, if you look at the record, the family was being provided the services in the natural environment in the home. It was because there were twins involved, and it was because they were not able to communicate at all except through the PECS program that it was felt that they could better be served by having the specialized services provided at Cades, where there were special people working with other children with some similar problems so the children could see that other children were able to communicate with the picture books or with the different items, and they would be able to help each other, and that was done. And what's really frightening here is that you have to be careful what we wish for. Judge Hart was led to believe in this case that there were no services provided to these children for five months, that they didn't get speech or physical therapy or occupational therapy, that they got nothing at Cades. If the plaintiff puts into the record evidence that says my children aren't receiving these services, they don't mislead the court and say it's not that they're not available someplace, they make a truthful statement, my children are not receiving these services. We'd have to come right in and rebut that with evidence. And you didn't, did you? Because there was no evidence. This mother, father, anyone, no one came and said these services were not being provided. The issue was they wanted all the services provided at the preschool. They wanted all of the Cades people to march into the preschool for that two-hour period and do speech therapy, occupational therapy, physical therapy, and all of that. What would that do to the preschool program of two hours? And where would that provide those children with the two hours with typical peers? Because the typical peers didn't need the speech therapy. Hold on just a second. I'm just trying to deal with the evidence issue here. I've got a burden of proof question that you folks have raised. If we look at the record and go to the pages that Ms. Ransom has cited to us and we agree that that is some evidence and you folks have no evidence, would you agree that that means on a summary judgment record they came forward, you didn't, that means you lose? If you can find any evidence in this record, and I have looked at it a hundred and thousand times I think at this point, that the services were discontinued to this family while the children were at St. Bates, then I welcome you to find against the county. The county would welcome you to find against them. Their issue has always been that they can't take all of those services that are provided to children who need specialized services and run them all into private settings where they don't have that kind of relationship with the places, as they do over three years old, where you have public settings, where you have the speech therapists on site and the physical therapists, where you can actually maneuver the children to this room and that room and back and forth and all of that. This is not that. But you did it though, right? Pardon me? You did it. No, we didn't do it. What they did do as the time progressed was to add in additional services, make a new plan, basically, a new plan to come into the new setting and add some things in to try to facilitate the children's integration in a program with non-disabled children. But it wasn't the same program anymore. The speech therapy, the speech therapy that the special needs required was still being provided outside of the St. Bates setting. Occupational therapy, obviously, outside of the setting. All of that outside of the setting. The hearing officer in this case, believe me, if you saw one hint in the hearing in this case, or in the opinion of the hearing officer, that there were no services provided, she would have said, 40 hours speech therapy not provided to this child, 30 hours of this, this wasn't done, this wasn't done. She found that nothing wasn't done. It was all about location, location, location. It wasn't about provision of services, just location. And this lawsuit wasn't about provision of services, it was about attorney fees. Nice to meet you, Donna. Thank you. We thank counsel for very helpful arguments and we'll take the matter under advisement. Next we'll call the